Charles C. CLOUTIER, Sr., et al., Plaintiffs,

v.

The UNITED STATES, Defendant.

No. 384–86L.

United States Claims Court.

Jan. 23, 1990.

As Corrected Jan. 24, 1990.

Nicholas F. LaRocca, Jr., Morgan City, La., for plaintiffs.

Alan Brenner, Washington, D.C., for defendant.

## OPINION

ROBINSON, Judge.

This matter is before the court on defendant's motion for summary judgment filed August 1, 1988, pursuant to RUSCC 56. This court denied defendant's motion to dismiss under RUSCC 12(b)(1) on December 9, 1987. Briefing of the issues presented in the pending motion is complete. For the following reasons, the court will grant defendant's motion.

## FACTS

Plaintiffs, residents of St. Mary Parish, Louisiana, own real property consisting of four contiguous lots, lying on the east bank of the Achafalaya River at Morgan City, Louisiana. On or about 1941, the Army Corps of Engineers began construction of a 13 foot high floodwall landward of the property to protect Morgan City from flooding on the lower Achafalaya River. In 1947, the floodwall's second stage was completed. Since the floodwall would increase the flowage of water over the property at high stages of the river, the government purchased flowage easements from property owners on the river side of the floodwall based upon the amount of water the floodwall would cause to be contained on their property. Government calculations indicated that a 13 foot floodwall could potentially increase flowage of water up to approximately 1.5 million cubic feet per second. The owners of three of the four parcels of property were fully compensated for the easements granted to the Army Corps of Engineers based upon these flowage calculations.

The easements were purchased in 1940 and 1941 pursuant to a Congressionally authorized project on May 17, 1940, called "Extension of Morgan City Front Levee." The easements conveyed

> ... the full, complete and perpetual right, power, privilege, and easement or servitude, in, on, and to the lands described below, for the purpose of utiliz-

ing the same as a floodway, of overflowing by floodwaters of the Mississippi River and its tributaries in accordance with the provisions of Act No. 391, 70th Congress, ...

Over the ensuing years the natural deltaic conditions of the Achafalaya River have caused the riverbed to rise and the water to pass at an increasingly greater height. This increase in the height of the river combined with massive floods in 1973, prompted the Corps to erect "mud boxes" —made of plywood and filled with shells, rock, and other similar materials—on top of the floodwall, which increased the height of the wall from 13.0 feet to 19.4 feet mean sea level (MSL) to protect the city from rising waters. In 1975, these mud boxes were reinstalled due to the deterioration of the older mud boxes.

A re-evaluation study of the project flood flow line or capacity resulted in Congressional approval in 1979 of the "New Morgan City Floodwall Project." Plaintiffs acquired the four contiguous lots that comprise the property at issue at various times in 1978, 1981, 1982 and 1984.

In 1983, construction commenced on the New Morgan City Floodwall on the river side of the old wall, but as close as possible to that wall. It was completed in May 1986 to the height of 23.8 feet MSL. The old flood wall was subsequently dismantled.

It is undisputed that the flood waters of the Achafalaya River have never risen to the 13 foot height since its completion in 1947. Oral Argument at 18. Thus, it is also uncontested that the new floodwall, above 13 feet, has not diverted any flood waters since its completion in May, 1986. Oral Argument at 18.

Plaintiffs brought suit in this court on June 17, 1986, seeking compensation for the taking of plaintiffs' land under the Fifth Amendment to the U.S. Constitution, and under an implied-in-fact contract under 33 U.S.C. § 702a–10 and § 702d in the total amount of $350,000. Their amended complaint, filed November 5, 1986, amended the description of plaintiffs' property in Article III of the original complaint.

Defendant's Motion to Dismiss under RUSCC 12(b)(1) alleged that the government was immune from suit under 33 U.S.C. § 702c for the compensation sought, whether the claim was based upon the provisions of § 702c or the Fifth Amendment. The court denied defendant's motion in an unpublished opinion dated December 9, 1987.

## DISCUSSION

■ The court must consider defendant's motion for summary judgment on its own merits. *Mingus Constructors v. United States,* 812 F.2d 1387 (Fed.Cir.1987). Summary judgment is proper when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. RUSCC 56(c). An adverse party may not rest upon the mere allegations or denials of his pleadings. RUSCC 56(f). Further, inferences drawn from the facts "must be viewed in the light most favorable to the party opposing the motion." *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1961). However, a mere "metaphysical doubt" will not prevent the granting of a summary judgment motion. *Matsushita Elect. Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1355, 89 L.Ed.2d 538 (1986). Where the record taken as a whole would not lead a rational trier of fact to find for a nonmoving party, there is no genuine issue for trial. *Id.* at 587, 106 S.Ct. at 1356 (citing *First National Bank v. Cities Service,* 391 U.S. 253, 254, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)).

■ The summary judgment procedure isolates and disposes of factually unsupported claims or defenses, *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986), serves judicial economy, and saves time and expense when trial is unnecessary. A summary judgment motion must be granted against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and in which that party will bear the burden of proof at trial. A complete failure of proof concerning an essential element of the non-movant's case entitles the movant to judgment as a matter of law. *Celotex v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

■ A movant for summary judgment has the burden of showing the absence of genuine issues of material fact. *Adickes v. Kress,* 398 U.S. 144, 159, 90 S.Ct. 1598, 1609, 26 L.Ed.2d 142 (1970). This does not mean that the burden is on the movant to produce evidence showing the absence of a genuine issue of material fact with respect to an issue on which the non-movant bears the burden of proof. The movant's burden may be discharged by showing that there is an absence of evidence to support the non-moving party's case. *Sweats Fashions, Inc. v. Pannill Knitting Co.,* 833 F.2d 1560, 1563 (Fed.Cir.1987).

■ A material fact is one which will make a difference in the result of a case. *See Curtis v. United States,* 168 F.Supp. 213, 216, 144 Ct.Cl. 194 (1958), *cert. denied,* 361 U.S. 843, 80 S.Ct. 94, 4 L.Ed.2d 81 (1959). The substantive law identifies the facts that are material. A judge does not weigh the evidence and determine the truth of the matter, but only determines whether there is a genuine issue for trial. *Anderson v. Liberty Lobby,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

■ Before the court may consider the merits of a given case, it must ascertain whether it has proper jurisdiction over the action. *Northern Indian Housing and Development Counsel v. United States,* 12 Cl.Ct. 417, 420–21 (1987). Defendant's first contention deals with the statute of limitation's bar based upon the assumption that the construction of the mud boxes upon the top of the 13 foot floodwall constituted a taking of plaintiffs' property.

The applicable statute of limitations in this case provides that every claim of which this court has jurisdiction "shall be barred unless the petition thereon is filed within six years after such claim first accrues." 28 U.S.C. § 2501 (1982). Therefore, since the mud boxes were constructed in 1973 and again in 1975, it argues that, even if

there was a taking of an additional flowage easement, the six year statute of limitations bars plaintiffs' suit.

Plaintiffs' response is that the mud boxes would have been ineffectual as restraints against floodwaters above 13 feet because of their wood construction. Affidavit of R.S. Wadhams. Although defendant does not concede this point, this is not a disputed *material* issue of fact which would require a trial, since as will be seen the efficacy of the mud boxes will not make a difference in the result of this case.

Defendant next contends that plaintiffs have no standing to sue because they acquired their four parcels beginning in 1978, well after completion of construction of the mud boxes and again, assuming *arguendo* that the mud boxes constituted a taking, plaintiffs are barred because they were not lawful owners of the property at the time of the taking. *United States v. Dow*, 357 U.S. 17, 20, 78 S.Ct. 1039, 1043, 2 L.Ed.2d 1109 (1958) (other case citations omitted). Therefore, defendant contends that the Assignment of Claims Act (31 U.S.C. § 3727 (1982)) bars their claims. The Assignment of Claims Act prohibits "a transfer or assignment of any part of a claim against the United States Government or of an interest in the claim" unless the claim has already been allowed, the amount of the claim has been decided, and a warrant for payment has been issued. *Cooper v. United States*, 8 Cl.Ct. 253, 254–255 (1985).

While it is true that the lack of efficacy of the mud boxes is the basis for plaintiffs' contention that no taking occurred upon their completion, any factual dispute as to the efficacy of the mud boxes need not be decided. Instead, the court will address the issue of whether a taking has in fact occurred, which is the assumption upon which these arguments are premised.

The evidence conclusively shows that there have been no major floods in Morgan City since completion of construction of the 13 foot floodwall which raised flood water levels up to the 13 foot height. In short, neither the 6.4 feet of mud boxes nor any of the new floodwall above 13 feet has ever repelled or diverted Achafalaya River flood waters to any degree. Plaintiffs have adduced no evidence to show that the new floodwall must at any time in the immediate future inevitably divert such flood waters above 13 feet. Consequently, it is impossible to determine with any degree of certainty at this point exactly where such future flooding might occur, how high it might go, how many cubic feet of water might be expected to pass by in the Achafalaya River or over plaintiffs' property, or how long the river might be expected to flow above the 13 foot level.

An accurate estimate of flowage is further complicated—as plaintiffs admit—by obvious natural variables. Such variables include the amount of sedimentation in the river bed (deltaic deposits), future weather conditions, and the degree of erosion of river banks upstream from Morgan City. Other variables are the degree of diversion required of Mississippi River waters to the Achafalaya River from the flood control gates upriver, which are used to prevent excessive flooding on the lower Mississippi, and the extent of future dredging performed on the Achafalaya River. All of these factors have a direct bearing on the potential cubic feet of water that may flow by or across plaintiffs' property during flooding of the Achafalaya River at any given time.

Plaintiffs' property is being used substantially as it has been since they acquired it. Oral Argument at 24. The perceived threat of flooding above 13 feet has not caused them within the five years since completion of the new floodwall to materially change their access to their property, to increase the elevation of their structures, or to redesign such structures in anticipation of being faced with additional flowage. Oral Argument at 24. This inaction suggests that plaintiffs may regard any potential increase in flowage, at best, as speculative and, at worst, only a minor threat to their uninterrupted use and occupancy of the property for the reasonably foreseeable future.

In these circumstances, the court would be forced to indulge in pure speculation to

resolve these questions. Clearly, this court is not permitted to engage in such speculation in order to conclude that an additional flowage easement has been taken *at this time* based upon the undisputed facts presented.

Plaintiffs' argue that several dam and reservoir cases support a finding of a taking due to the new floodwall. In *Hilton v. Duke Power Co.*, 254 F.2d 118, 123 (4th Cir.1988), upon which plaintiffs rely, the facts show that defendant erected a dam in 1919 on the Wateree River in the State of South Carolina, to a height of 212 feet MSL and later raised it to a height of 218 feet in 1925. The impounded water has been maintained at the 218 foot level since that time. The appellate court held that the trial judge erred in granting judgment N.O.V. to defendant with respect to a jury verdict for $5,000 for actual damage and future foreseeable injury to one of four tracts of land involved in the litigation. The court's ruling, however, rested upon the fact that there was *some* actual present injury to the tract of land due to the additional impoundment of water, which damage was not subject to abatement. Further, the court's reversal was based upon the continuing and increasing damage attributable to the impoundment which the court said the jury could determine or estimate. The court found that raising the dam by six feet caused *immediate* additional injury and a new non-compensated taking for which the power company was liable to pay just compensation not only for the past injury, but also for future foreseeable damages.

The *Hilton* case is easily distinguishable from the facts in the case at bar. There admittedly has not been, as yet, even $1.00 of actual physical injury to plaintiffs' property as a result of the added height to the new Morgan City floodwall. Oral Argument at 18, 24. Without proof that some damage has already occurred, plaintiffs' claim of a taking is simply not ripe for a decision. The facts show that plaintiffs' potential *future* damages attributable to an increase in water flowage is entirely speculative and cannot be determined or estimated at this time.[1]

The other cases plaintiffs rely upon involve the same or similar fact patterns as that presented in *Hilton, i.e.*, an *existing* or a provable *inevitable* injury from the construction involved. Therefore, they need not be separately addressed in this opinion. *Hendricks v. United States*, 14 Cl.Ct. 143, 149 (1987); *United States v. 2,648.31 Acres of Land*, 218 F.2d 518, 519 (4th Cir.1985). All are factually distinguishable and are inapposite. In this case, it is clear that no greater amount of water inevitably will flow over plaintiffs' property by virtue of the higher floodwall. Even when the evidence is viewed in a light most favorable to plaintiffs, the conclusion is inescapable that the potential damage to and loss of use of plaintiffs' property is far too speculative to support a taking claim at this time. *Olson v. United States*, 292 U.S. 246, 257, 54 S.Ct. 704, 709, 78 L.Ed. 1236 (1934).

The alleged potential taking is not a classic physical invasion type of taking claim because no damage from flooding above 13 feet has occurred. *See Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 427, 102 S.Ct. 3164, 3171, 73 L.Ed.2d 868 (1982); *Pumpelly v. Green Bay Co.*, 13 Wall. 166, 20 L.Ed. 557 (1871). But if such flooding were to occur at some time in the future (along with an excess of 1.5 million cubic feet of water volume in the Achafalaya River), to show a taking under the Fifth Amendment, plaintiffs must still prove that the resultant flowage across their property not only caused damage, but sufficient damage to destroy or impair the usefulness of their property. *Sanguinetti v. United States*, 264 U.S. 146, 148, 44 S.Ct. 264, 265, 68 L.Ed. 608 (1923); *Id., Pumpelly* 13 Wall. at 181. In

---

1. Defendant argues that there is a significant difference between the "impoundment" of water behind a dam and the "diversion" of water effected by a floodwall. However, both structures are capable of causing damage to inundated real estate whether due to temporarily increased flowage of rushing water or a permanently increased water level in a lake. The distinction is immaterial in this case.

any event, under present circumstances plaintiffs have failed to show any property damage upon which a taking of this type must necessarily rest. *Terteling v. United States,* 167 Ct.Cl. 331, 338, 334 F.2d 250, 254 (1964).

In *Florida Rock Industries, Inc. v. United States,* 791 F.2d 893 (Fed.Cir.1986), the Corps of Engineers denied a Section 404 permit under the Clean Water Act to a limestone mining company to discharge dredged or fill material into navigable waters and other waters of the United States onto 98 acres which would accommodate three years production. The company actually owned 1,560 acres, but limited the scope of the application to only the 98 acres to get favorable consideration by the Corps. Plaintiffs' testimony showed that denying a permit for the 98 acres because of the loss of wetland would also preclude a permit for any other part of the tract. However, the trial court found a taking only of the 98 acres. The Court of Appeals affirmed the trial court's refusal to consider a taking of the balance of the acreage as too speculative, since there was no present plan to mine rock on the balance of the acreage. The court remanded the case on other grounds. *Florida Rock Industries Inc.* stands for the proposition that the mere possibility at some time after three years of a future Corps prohibition against mining on the remaining undeveloped acreage is too speculative to allow for a finding of a taking. Thus, *Florida Rock Industries, Inc.* is persuasive and very recent precedent for this court's determination that the mere possibility of future flooding beyond the flowage over the cubic gallons of water allowed in the easement—*i.e.,* over the 1.5 million cubic gallons per second—is too speculative to form the basis for a taking claim in this court.[2]

## CONCLUSION

It is unquestionably true that should the flood waters in the Achafalaya River rise

to a level exceeding the old floodwall height of 13 feet, plaintiffs' property will be inundated to a greater *depth* of water than before. It remains to be determined, however, whether under the terms of the easement that greater depth of water, should it ever occur and cause sufficient damage to be compensable, would require compensation to plaintiffs or to the then owners of the property. This court, however, need not in this opinion reach that question or the question as to whether the constructing of the mud boxes constituted a taking for purposes of the statute of limitations. For the above reasons the court finds that defendant's motion for summary judgment has merit. Accordingly, that motion is granted. The clerk is directed to dismiss the complaint without prejudice. No costs.

---

**2.** The court has not addressed defendant's contention that the easement granted to the Government is unrestricted as to the height of the floodwall and, if interpreted in accordance with the plain meaning of its terms, cannot be construed as limiting the height of the floodwall to only 13 feet. There is, however, no need for the court to reach this issue in view of its above findings.